PEOPLE v HANNA

Docket No. 183094. Submitted October 17, 1996, at Escanaba. Decided
     May 16, 1997, at 9:00 A.M. Leave to appeal sought.

Eric R. Hanna was convicted by a jury in the Chippewa Circuit Court,
     Nicholas J. Lambros, J., of operating a motor vehicle while under
     the influence of liquor and of attempting to resist and obstruct a
     police officer. The defendant pleaded guilty of OUIL, third offense,
     and was sentenced to concurrent terms of imprisonment of two to
     five years for OUIL 3rd and six months to one year for attempting to
     resist and obstruct a police officer. The defendant appealed.

     The Court of Appeals held:

     1. The Eighth Amendment prohibition of cruel or unusual punish-
ment does not apply to pretrial detainees and is not implicated in
this case by the arresting police officers' application of Do-Rite
sticks, two plastic rods connected by a one-inch cord, to the
defendant's wrists to subdue him following his arrest while a hospi-
tal employee drew blood from the defendant against the defend-
ant's wishes but pursuant to a search warrant that authorized blood
testing for alcohol content.

     2. A claim of excessive use of force against a combative detainee
is properly analyzed under the Fourth Amendment for reasonable-
ness of the seizure to determine whether the particular police
officer's actions are objectively reasonable in light of the facts and
circumstances confronting the officer. In this case, the police
officers acted reasonably in briefly using Do-Rite sticks to subdue
the defendant and to ensure the safe execution of the search war-
rant. The police officers had a strong and legitimate interest in
quickly and safely executing the warrant for the withdrawal of the
blood sample, and the nature and quality of the intrusion caused by
the devices to the defendant was not severe, unnecessary, or
unduly intrusive.

     3. The defendant's claim that he is entitled to a new trial because
there were no black jurors is without merit. The defendant has not
shown that blacks were purposely or systematically excluded from
the jury.

     4. The trial court did not err in admitting into evidence testimony
regarding the defendant's performance on field sobriety tests. The

evidence was relevant to the defendant's drunkenness, and the lay witnesses were qualified to render opinions formed from direct physical observation.

5. The search warrant was supported by ample evidence of probable cause provided by the results of a preliminary breath test and by the defendant's behavior and admission that he had been drinking alcohol.

6. The trial court did not abuse its discretion in ruling that the seventy-minute delay in drawing the defendant's blood sample was reasonable and did not render the test results inadmissible.

7. The trial court did not abuse its discretion in denying the defendant's motion for a new trial on the asserted ground that a police officer improperly testified that he had requested a preliminary breath test of the defendant. The trial court ordered the testimony stricken, and the jury did not learn of the test results.

8. The prejudicial effect of alleged misconduct by the prosecutor, to which the defendant did not object at trial, was not so great that, if misconduct did in fact occur, it could not have been cured by a cautionary instruction by the trial court to the jury.

9. The introduction of testimony regarding the defendant's willingness to "make a deal" does not require a new trial because the trial court sustained an objection by the defendant and ordered the testimony stricken pursuant to the parties' motions to strike.

10. The record does not support the defendant's claim of ineffective assistance of counsel at trial.

11. There was ample evidence in support of the defendant's convictions, and the jury's verdict was not against the great weight of the evidence.

Affirmed.

MACKENZIE, J, dissenting in part, stated that the use of Do-Rite sticks was not reasonable under the circumstances of this case and resulted in a violation of due process such that reversal is required. The police officers, given their size and strength and the availability of restraints at the hospital, should have been able to restrain the defendant without using the pain-inflicting Do-Rite sticks. The devices were not used to control the defendant, but to punish him with pain for not being cooperative during the withdrawal of the blood sample.

SEARCHES AND SEIZURES — COMBATIVE DETAINEES — EXCESSIVE USE OF FORCE.

A claim of excessive use of force by a police officer against a combative detainee is analyzed under the Fourth Amendment for reasonableness of the seizure to determine whether the officer's actions

are objectively reasonable in light of the facts and circumstances confronting the officer (US Const, Ams IV, XIV).

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *Patrick M. Shannon*, Prosecuting Attorney, and *William E. Molner*, Assistant Attorney General, for the people.

*Rudolph F. Perhalla*, for the defendant on appeal.

. Before: Gribbs, P.J., and MacKenzie and Griffin, JJ.

Griffin, J. Defendant was convicted by a jury of operating a motor vehicle while under the influence of liquor, MCL 257.625; MSA 9.2325, and attempting to resist and obstruct a police officer, MCL 750.479; MSA 28.747, MCL 750.92; MSA 28.287. He pleaded guilty of being a third-time OUIL offender and was sentenced to concurrent terms of two to five years' imprisonment for the OUIL 3rd conviction and six months to one year for the attempted resisting and obstructing conviction. Defendant appeals as of right both convictions. We affirm. In doing so, we hold that, under the totality of the circumstances of this case, the police did not violate defendant's Fourth Amendment rights by briefly restraining him with a pain compliance device in order to execute a warrant for a blood sample.

I

After the police stopped defendant for speeding, he stumbled out of his vehicle, stood unsteadily, and with slurred speech admitted that he had been drinking. Thereafter, defendant failed a field sobriety test, refused to take a Breathalyzer examination, and vomited in his jail cell. While arresting officers Bradley LaCross and Michael Troyer drove defendant to a hospital to execute a warrant to draw a sample of

defendant's blood, defendant proclaimed repeatedly in a loud, angry voice that he would not permit anyone to draw his blood.

Defendant became "very uncooperative" at the hospital and refused to lie on the examination table. Defendant jerked his arm away from the laboratory technician who attempted to draw his blood. Concerned about the safety threat posed by defendant's evasive conduct, the two officers restrained defendant by laying him on the examination table and applying for "a few seconds" "Do-Rite sticks"[1] to pressure points on defendant's wrists. The pressure subdued defendant, who then relaxed and permitted the laboratory technician to draw his blood.

Officer LaCross described Do-Rite sticks as being two plastic rods connected with a one-inch cord. The device is used by wrapping the cord around certain pressure points and exerting pressure by briefly pulling or twisting the handles.[2] LaCross testified that the device inflicts a "quick and simple" discomfort that causes no injury or lasting pain. According to LaCross, all Sault Ste. Marie police officers receive training before receiving certification to carry and use Do-Rite sticks.

After trial, defendant claimed that the use of Do-Rite sticks constitutes cruel and unusual punishment. The trial court rejected defendant's argument finding that, under the circumstances of this case, the police used Do-Rite sticks "in a reasonable fashion[]" to "subdue" defendant and execute the warrant.

---

[1] This device is spelled inconsistently in the briefs and record as either "Do-Rite" or "Do Right."

[2] Because the use of these Do-Rite sticks was not made an issue at trial, the record does not fully depict how this device is made or used.

II

Defendant claims that it is "cruel and unusual for the police to have the ability to forcibly draw blood from an individual for a violation of the motor vehicle code." However, because defendant cites no authority to support this proposition, we consider the issue to be waived. *People v Piotrowski*, 211 Mich App 527, 531; 536 NW2d 293 (1995). Furthermore, the Eighth Amendment is inapplicable because defendant was only a detainee at the time of the alleged misconduct. *Brewer v Perrin*, 132 Mich App 520, 529, n 3; 349 NW2d 198 (1984), citing *Bell v Wolfish*, 441 US 520, 535, n 16; 99 S Ct 1861; 60 L Ed 2d 447 (1979).

Nevertheless, the dissent cites *Rochin v California*, 342 US 165, 166; 72 S Ct 205; 96 L Ed 183 (1952), for the proposition that the use of Do-Rite sticks to subdue a combative detainee violates the Due Process Clause of the Fourteenth Amendment. However, in *Graham v Connor*, 490 US 386, 388, 392-393, 394; 109 S Ct 1865; 104 L Ed 2d 443 (1989), the United States Supreme Court specifically rejected the amorphous "substantive due process," or "shock the conscience" approach applied in *Rochin, supra,* and held that excessive force claims must be analyzed under the Fourth Amendment's "objective reasonableness" standard. See also *Lester v Chicago*, 830 F2d 706, 710-711 (CA 7, 1987). Thus, the issue is whether the search and seizure is unreasonable under the Fourth Amendment, as applied to the states through the Due Process Clause of the Fourteenth Amendment; not whether the search and seizure violates Due Process. See *Electro-Tech, Inc v H F Campbell Co*, 433 Mich 57, 127-128; 445 NW2d 61 (1989) (BRICKLEY, J., dissenting); *Lester, supra* at 710-711.

In determining the reasonableness of a particular seizure, we must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham, supra* at 396 (internal quotations marks omitted); see *People v Holloway*, 416 Mich 288, 299; 330 NW2d 405 (1982). In excessive force cases, we determine if the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, not with 20/20 hindsight. *Graham, supra* at 397; *Hammer v Gross*, 932 F2d 842, 846 (CA 9, 1991). Because drawing blood is not, in itself, unreasonable under the Fourth Amendment, see *Schmerber v California*, 384 US 757, 771; 86 S Ct 1826; 16 L Ed 2d 908 (1966); *People v Perlos*, 436 Mich 305, 313; 462 NW2d 310 (1990), we must decide whether police officers may use Do-Rite sticks to subdue a suspect who is resisting a legal warrant to draw blood.

No Michigan case directly addresses this issue. However, in *Holloway, supra*, our Supreme Court held that the police acted reasonably in pressing on the suspect's throat and pinching the pressure points on his jaw to gain access to and search his mouth for hidden evidence. See also *Wayne Co Prosecutor v Recorder's Court Judge*, 149 Mich App 183, 187; 385 NW2d 652 (1986). Thus, it is not necessarily unreasonable for police to painfully manipulate pressure points as a means to search for dissolvable evidence. *Holloway, supra*; *Recorder's Court Judge, supra*. Because pain compliance techniques are not necessarily illicit, *Holloway, supra*, the issue is not whether Do-Rite sticks are unconstitutional because they cause temporary pain. Rather, the issue is

whether the kind or degree of pain caused by Do-Rite sticks is unreasonable under the circumstances of this case.

In *Forrester v San Diego*, 25 F3d 804 (CA 9, 1994), cert den 513 US 1152; 115 S Ct 1104; 130 L Ed 2d 1070 (1995), the Ninth Circuit Court of Appeals addressed the reasonableness of using a device similar to Do-Rite sticks. In a 2-1 decision, the majority upheld a jury finding that San Diego police officers did not use excessive force in using "Orcutt Police Nonchakus" (two wooden sticks each connected at one end by a cord) to disperse demonstrators who resisted arrest by going limp. Noting that the device seemed to cause less pain than other permissible compliance techniques, the *Forrester* majority held that police acted reasonably in twisting the device around the wrists of demonstrators whom they were trying to arrest or disperse. *Id.* at 807, 809. The dissent agreed that intentional infliction of pain by police is not unconstitutional per se. *Id.* at 814 (Kleinfeld, J., dissenting). However, the dissenting judge opined that, because the technique proved totally ineffective at moving the limp demonstrators, the continued use of the device was done to "punish" nonviolent, passively resisting demonstrators "for refusing to get up and walk." *Forrester*, *supra* at 811-813. Because it was used for no reason other than to punish, the dissenting judge deemed the continued use of the device to be unreasonable. *Id.*

III

In the present case, after evaluating the totality of the circumstances, we agree with the ruling of the trial court and hold that the police acted reasonably

in briefly using Do-Rite sticks to subdue defendant and ensure the safe execution of the search warrant. First, the police clearly had a strong and legitimate interest in executing the warrant to draw defendant's blood as soon as possible. See *Perlos, supra* at 327-328. Further, the laboratory technician testified that he could not have safely drawn defendant's blood unless defendant ceased his combative conduct. Indeed, were he not pacified, defendant could have injured himself or others by causing the needle to inadvertently lacerate or break. With the obvious harm inherent by a misdirected or broken needle, the police were legitimately concerned about subduing defendant in order to facilitate the safe and effective execution of the warrant. Otherwise, defendant could have caused injury and thwarted the execution of the warrant.

Second, the nature and quality of the intrusion on defendant's person was not severe, unnecessary, or unduly intrusive. Officer LaCross and the laboratory technician testified that defendant was so combative that handcuffs and bed restraints would not have effectively prevented him from moving during the drawing of his blood. Even if the two officers were large and strong enough to control the defendant without using Do-Rite sticks, it is doubtful whether the force exerted in physically overpowering, positioning, and holding the combative defendant would have been less violent or caused less pain than the quick application of the Do-Rite sticks. In addition, we question whether without extreme force or the potential for pain the two officers could have held defendant still enough to ensure a safe, effective

blood test. On this issue, we agree with the Ninth Circuit majority in *Forester*, *supra* at 807-808 that

> [p]olice officers . . . are not required to use the least intrusive degree of force possible. Rather, as stated above, the inquiry is whether the force that was used to effect a particular seizure was reasonable, viewing the facts from the perspective of a reasonable officer on the scene. See *Graham*, 490 US at 396. . . . Whether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue. See *Hammer*, 932 F2d 846.

Defendant makes no claim that the sticks caused him severe pain or injury. On the contrary, the laboratory technician testified that defendant showed no signs of pain whatsoever. Furthermore, unlike the scene depicted by the dissenter in *Forrester*, the evidence in this case does not establish that the police used Do-Rite sticks simply to punish. Rather, Officer LaCross applied the sticks only for a few seconds to subdue and protect the safety of the combative defendant. Under these circumstances, we agree with the trial court that the Do-Rite sticks were reasonably applied and constituted a reasonable means of controlling defendant and executing the search warrant. Indeed, the pain caused by the brief application of Do-Rite sticks appears less severe than the choke hold and jaw poking our Supreme Court deemed reasonable in *Holloway*. If the use of Do-Rite sticks were held to be unreasonable simply because they briefly inflict pain, then not only is *Holloway* wrongly decided, but arm twisting, limb holds, and many other commonly used and essential compliance methods would be unconstitutional. We will not subscribe to

such an oppressive and unnecessary restriction of law enforcement.

IV

There is no merit in defendant's remaining issues on appeal. Defendant claims that a new trial is required because there were no black jurors. However, defendant did not challenge the jury array below, and he cites no legal authority to support his argument on appeal. Therefore, defendant has abandoned this unpreserved issue. *People v Hubbard (After Remand)*, 217 Mich App 459, 465; 552 NW2d 493 (1996); *Piotrowski, supra* at 530. In any event, defendant has not shown that black citizens were purposely or systematically excluded from the jury. *Hubbard, supra* at 473.

Defendant also argues that the trial court committed error requiring reversal in admitting testimony regarding defendant's performance on field sobriety tests. However, defendant again fails to cite authority in support of his argument. Thus, this issue is also abandoned. *Piotrowski, supra* at 530. Nevertheless, the evidence was relevant to establish defendant's drunkenness and lay witnesses are qualified to testify about the opinions they form as a result of direct physical observation. MRE 701; *Lamson v Martin (After Remand)*, 216 Mich App 452, 459; 549 NW2d 878 (1996).

Next, defendant contends that the search warrant authorizing police to draw defendant's blood was not based on probable cause. We disagree. Defendant's preliminary breath test, which indicated a 0.169 blood alcohol level, in itself justifies a reasonable person's conclusion that defendant's blood could reveal an

alcohol level exceeding the limit for lawful driving. See, generally, *People v Stumpf*, 196 Mich App 218, 226-227; 492 NW2d 795 (1992); *People v Tracy*, 186 Mich App 171, 174; 463 NW2d 457 (1990). This is especially true where defendant staggered out of his vehicle, admitted that he had been drinking, made several errors in reciting the alphabet, and vomited in his jail cell. *Stumpf, supra* at 226-227.

Defendant also argues that the results of his blood test were inadmissible because his blood was not timely drawn. Again, we disagree. The reasonableness of any time lapse is consigned to the trial court's sound discretion. *People v Schwab*, 173 Mich App 101, 104; 433 NW2d 824 (1988). We find no abuse of discretion. Particularly where an expert testified that the delay was reasonable, a seventy-minute delay, without more, does not render the blood evidence inadmissible. See *People v Jacobsen*, 448 Mich 639, 641; 532 NW2d 838 (1995).

Next, defendant claims that reversal is required because a police officer testified that he requested a "PBY" (preliminary breath test) from defendant. However, the trial court ordered the testimony stricken, and the jurors did not learn of the test results. Contra *People v Keskinen*, 177 Mich App 312, 319-320; 441 NW2d 79 (1989). Under these circumstances, we conclude that the trial court did not abuse its discretion in denying defendant's motion for a new trial on this basis. *People v Herbert*, 444 Mich 466, 477; 511 NW2d 654 (1993); see *People v McAlister*, 203 Mich App 495, 504; 513 NW2d 431 (1994).

Defendant also argues that the prosecutor committed several instances of misconduct. We disagree. In any event, even if we assume arguendo that the pros-

ecutor made some improper remarks, the prejudicial effect of the unobjected-to and relatively innocuous comments was not so great that they could not have been cured by a cautionary instruction. *People v Vaughn*, 186 Mich App 376, 385; 465 NW2d 365 (1990).

Defendant contends that the trial court should have granted defendant a new trial because the trial court admitted testimony regarding defendant's willingness to "make a deal." However, because the trial court sustained defendant's objection and followed both parties' motions to strike this testimony from the record, we find no error. See *McAlister, supra* at 504.

Next, defendant claims that he was denied the effective assistance of counsel. We disagree. After a thorough review of the record, we conclude that defendant has neither sustained his burden of proving that counsel made a serious error that affected the result of trial nor overcome the presumption that counsel's actions were strategic. *People v LaVearn*, 448 Mich 207, 213; 528 NW2d 721 (1995); *People v Stanaway*, 446 Mich 643, 666, 687-688; 521 NW2d 557 (1994); see also *People v Hyland*, 212 Mich App 701, 710; 538 NW2d 465 (1995), vacated in part on other grounds 453 Mich 900 (1996).

Finally, defendant contends that the verdict was against the great weight of the evidence. We disagree. There was ample evidence to sustain defendant's convictions. *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992).

Affirmed.

GRIBBS, P.J., concurred.

MACKENZIE, J. *(concurring in part and dissenting in part).* I respectfully dissent from that portion of the majority opinion upholding the use of "Do-Rite sticks." In my opinion, the evidence obtained against defendant through the use of the Do-Rite sticks should have been suppressed because the use of these pain compliance devices to obtain evidence for a prosecution violated the Due Process Clause of the United Sates Constitution. In all other respects, I concur.

Arresting officer Bradley LaCross described the nature of Do-Rite sticks, and the use of the devices on defendant to obtain his compliance with the taking of a blood sample, as follows:

> *Q.* What steps occurred then to get ahold of the situation?
> *A.* He was asked to lay [sic] down on the bed, which he refused to do. Finally, he was informed to lay [sic] down or we would lay him down on the bed, at which time Officer Troyer and myself laid Eric Hanna down on the bed and the do right [sic] sticks were applied to his wrists.
> *Q.* And the do right [sic] sticks are restraints? I would just maybe have you explain to the jury what that is.
> *A.* They are two pieces of plastic approximately this long attached by approximately a one-inch rope. They are used to restrain people, are considered a technique for compliance.
> *Q.* What effect do they have upon the person they are applied to?
> *A.* They are designed to gain compliance. *Once compliance is gained the pressure is supposed to be relieved in order to not cause any injury or long-term pain.*
>
> *         *         *
>
> *Q.* And just explain to the jury as far as your action and your use of them as to Mr. Hanna. How did you do that?
> *A.* How did we apply them?

*Q.* You say there was control on the amount of pressure?

*A.* I applied it at the wrist with soft hands. I applied pressure when the lab technician was coming up to draw the blood because Mr. Hanna started to pull away. *Pressure was applied. He was told repeatedly. At which time he complied after the pain was applied to him.*

*Q.* Pain, it sounds pretty bad. Was it pinching? How does it all work?

*A.* It's just through pressure points that are learned through our training. *It's not a permanent pain. It's just real quick and simple. It is used for compliance for subjects that aren't cooperative.*

*Q.* You indicated, I thought, soft hands, if I am quoting you correctly. What does that denote and relate it to other types of procedures that you might have used.

*A.* It wasn't used as a restraining instrument or any type of a weapon for use of force that way.

*Q.* Okay. Are they able to be used in that manner?

*A.* Yes, they are.

\*　　\*　　\*

*Q.* If you had not had the do right [sic] devices at this time, Officer, would you have been able to get the blood?

*A.* No.

\*　　\*　　\*

*Q.* In the case here with Mr. Hanna how long did you have them applied to him?

*A.* A few seconds.

*Q.* And was the same degree of pressure constant as far as the pair of restraints you were controlling?

*A.* There was a short, very short period of pressure, maybe two seconds, at which time he laid [sic] still. At that time the pressure was released and Mr. Hanna was informed if he didn't comply further pressure was going to be reapplied.

*Q.* Now, what was his response to that statement?

*A.* At that time he laid [sic] still. [Emphasis added.]

Defendant asserts that, as a matter of law, giving the police the ability to forcibly draw blood from an individual for a violation of the Vehicle Code amounts to cruel and unusual punishment, presumably under the Eighth Amendment. Because defendant was merely a detainee, however, the Eighth Amendment does not apply. See *Brewer v Perrin*, 132 Mich App 520, 529, n 3; 349 NW2d 198 (1984). Nevertheless, the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment. *Graham v Connor*, 490 US 386, 395, n 10; 109 S Ct 1865; 104 L Ed 2d 443 (1989); *Bell v Wolfish*, 441 US 520; 99 S Ct 1861; 60 L Ed 2d 447 (1979).

The state may force a person suspected of driving while intoxicated to submit to a blood alcohol test. *South Dakota v Neville*, 459 US 553, 559; 103 S Ct 916; 74 L Ed 2d 748 (1983); *Schmerber v California*, 384 US 757, 771; 86 S Ct 1826; 16 L Ed 2d 908 (1966). Thus, in this case, requiring defendant to allow a sample of his blood to be taken did not in itself violate his substantive due process rights. However, as noted in *Schmerber, supra,* "[i]t would be a different case if the police . . . responded to resistance with inappropriate force." *id.* at 760, n 4. See also *Neville, supra* at 559, n 9; *People v Holloway*, 416 Mich 288, 299; 330 NW2d 405 (1982). In my opinion, the police in this case did just that.

In *Rochin v California*, 342 US 165, 166; 72 S Ct 205; 96 L Ed 183 (1952), police officers entered the defendant's home and observed him place some capsules in his mouth. The officers attempted to forcibly extract the capsules but were unable to do so. Following this,

[Rochin] was handcuffed and taken to a hospital. At the
direction of one of the officers a doctor forced an emetic
solution through a tube into Rochin's stomach against his
will. This "stomach pumping" produced vomiting. In the
vomited matter were found two capsules which proved to
contain morphine. [*Id.* at 166.]

Eventually, the defendant was convicted of illegally
possessing morphine. The Supreme Court, in revers-
ing Rochin's conviction under the Due Process
Clause, stated:

This is conduct that shocks the conscience. Illegally
breaking into the privacy of the petitioner, the struggle to
open his mouth and remove what was there, the forcible
extraction of his stomach contents—this course of proceed-
ing by agents of government to obtain evidence is bound to
offend even hardened sensibilities. They are methods too
close to the rack and the screw to permit of constitutional
differentiation. [*Id.* at 172.]

Since *Rochin* was decided, the Supreme Court has
clarified that claims of excessive force under the Due
Process Clause should be analyzed under the Fourth
Amendment "reasonableness" standard. *Graham,
supra* at 395. The question is not simply whether the
force was necessary to accomplish a legitimate police
objective; it is whether the force used was reasonable
in light of all the relevant circumstances. *Hammer v
Gross*, 932 F2d 842, 846 (CA 9, 1991).

The use of the Do-Rite sticks in this case was not
reasonable under all the circumstances. Two officers
were with defendant when his blood was drawn by a
medical technician. Defendant repeatedly insisted
that he did not want to be stuck with a needle
because he was afraid of contracting AIDS. The
officers each used the Do-Rite sticks when defendant,

who was lying on a hospital bed, pulled his arms inward against his chest. Unquestionably, it was necessary to restrain defendant's movement for his own safety. Nevertheless, in my opinion, the use of the Do-Rite sticks was excessive. The record indicates that defendant was 5' 9" tall and weighed 170 pounds. Officer LaCross, on the other hand, was 6' 1" and weighed 250 pounds; he was a weight lifter who could bench press 300 pounds. Officer Troyer was 5' 11" and weighed 215 pounds. It was undisputed that it took a matter of seconds to draw the blood. The two officers should have been able to restrain the supine defendant for such a brief time without resort to pain compliance devices. There was also evidence that hospital restraints were available to the officers. Under these circumstances, I find it both shocking and unreasonable that defendant was forced into compliance through the use of pain-inflicting devices.

The propriety of using devices called "Orcutt Police Nonchakus," pain compliance tools which, like Do-Rite sticks, consist of two sticks each connected at one end by a cord, was addressed in *Forrester v San Diego*, 25 F3d 804 (CA 9, 1994). Over a dissent, the two-judge majority upheld a jury finding that the police did not use excessive force in using the nonchakus against demonstrators. The dissenter distinguished between the use of *force* (possibly causing incidental pain) and the *direct infliction of pain* to coerce a person to act a certain way, and noted that the latter is, at least generally, constitutionally proscribed. The dissenter stated:

> To be reasonable, force has to be designed to accomplish a legitimate objective efficiently. The objective was to make the demonstrators move from where they were seated to

the vans. *But the force was not used to move the demonstrators into the vans. It was used to punish them for refusing to get up and walk to the vans. It worked as punishment does, by hurting people enough so that they do something to avoid it.* The nonchakus did not work like pinching the fatty part of the arm, or pulling a person by the finger, or a hammerlock, to move the demonstrators to the van. The nonchakus . . . were used as a pain inflicting device.

In this case, a more efficient pain compliance technique would have been for the officers to warn demonstrators that if they did not move voluntarily they would be burned with lighted cigarettes, and then hold the cigarettes against their skin until they complied. The pain would have been comparable, the risk of long term disability less than from tendon injury or fractures in the wrist, and the officers would have been able to keep one hand free. Probably one officer instead of two could have accomplished each arrest. I am quite sure we would not accept the use of lighted cigarettes against the skin as reasonable force in this case. Yet the nonchakus were worse. They inflicted more serious injuries, with longer lasting consequences, without working any better to arrest people rapidly with minimum police effort. The difference may be that nonchakus at least look like dragging devices. But they were not being used to drag, so that distinction does not work.

*     *     *

. . . The *Graham* standard of reasonable force bars this use of pain as a law enforcement tool. The intentional infliction of pain was not a reasonable means of achieving a legitimate end. [*Id.* at 813-814, 815 (emphasis added).]

I agree with this reasoning. Like *Forrester*, the devices in this case were not used to directly control the physical actions of a person, but rather, were used to inflict pain to coerce a person into compliance. As such, the use of the Do-Rite sticks must be condemned as unreasonable.

Finally, it should be noted that "where power to punish is granted to persons in lower levels of administrative authority, there is an inherent and natural difficulty in enforcing the limitations of that power." *Jackson v Bishop*, 404 F2d 571, 579 (CA 8, 1968). In this case, Officer LaCross testified that he thought "just about everybody in the [Sault Ste. Marie police] department is qualified and certified" in the use of Do-Rite sticks. The potential for abuse of this device by unscrupulous police officers is obvious, and it would be difficult to establish a departmental policy distinguishing between "permissible" and impermissible levels of pain infliction.

As the Supreme Court remarked in *Rochin, supra* at 173, "to sanction the brutal conduct . . . would be to afford brutality the cloak of law." Because the evidence used against defendant to secure his conviction was obtained by unnecessary methods that offend the Due Process Clause, I would reverse.